## MILLER vs. THE STATE.

1. INDICTMENT: *Copy from record. Presumption.*

As the Act of March 1, 1881, authorizes the clerk to record only indictments found by the grand jury and returned into Court, it is legally presumed from the fact of his recording an indictment that it was found by the grand jury and returned into Court; and in case of the loss or destruction of the original, the defendant may be tried and convicted on a copy from the record, where there is no plea denying that the original had been found and returned by a grand jury into Court. On such a plea the State must produce the original or restored record entries, (if they have been restored), showing the finding and return of the indictment, or prove the destruction of the record entries, and that they had not been restored, and resort to secondary evidence of their contents. (EAKIN, J., dissenting; holding that conviction should not be sustained upon a copy from the record.)

APPEAL from *Prairie* Circuit Court.

Hon. G. D. DENISON, Special Judge.

*S. P. Hughes* for appellant.

The transcript in this case does not show the empannelling of the grand jury that found the bill of indictment, and the case must therefore be reversed. *Stuart*

*v. State,* 13 *Ark.,* 744; *Straughn v. State,* 16 *Ark.,* 44; *Beverly Brenn v. The State,* 7 *Eng.,* 624; *Cornelius v. State,* 7 *Eng.,* 782; *Green v. State,* 19 *Ark.,* 178.

There is no record of the presentment or filing of the indictment. *Hollen v. State* 2 *Florida,* 482; *Gordan v. People,* 2 *Seam.,* 83; *Commonwealth v. Canood,* 2 *Virginia Cases,* 527; *McKinney v. People,* 2 *Gilman,* 540; *Green v. State,* 19 *Ark.,* 183; *Ross v. State,* 19 *Ark.,* 198.

*C. B. Moore,* Attorney General, for the State.

Relics upon the Act of March 19, 1881 (*Acts* 1881, *p.* 106 7), which was intended to meet just such cases as this.

ENGLISH, CH. J. At the April term, 1883, of the Circuit Court of Perry county, Andy Miller was arraigned on a recorded copy of an indictment, charging in apt terms that he murdered Joseph Miller, on the 17th of September, 1881, by shooting him with a shot gun; he pleaded not guilty, was tried by a jury, found guilty of murder in the second degree, and his punishment fixed at imprisonment in the penitentiary for twenty-one years. He filed a motion for a new trial, which was overruled, and he took a bill of exceptions. He was sentenced in accordance with the verdict, and prayed an appeal, which was allowed by one of the Judges of this Court. The motion for a new trial was upon the ground that the verdict was contrary to the evidence, etc.; that the Court erred in refusing instructions moved for the prisoner, and in its general charge to the jury.

The case was tried before a special Judge, the regular Judge being disqualified to sit in the case.

The transcript on which the appeal was allowed contained no record entry showing the empanneling of a grand jury at the October term, 1881, when the indictment purports to have been found, and no record entry

showing the return of the indictment into Court by the grand jury.

A certiorari was awarded to the clerk of the court below for the purpose of supplying the omitted entries, upon which he returned "that the record of the Perry Circuit Court for the October term, 1881, at which term the grand jury was empanneled, and the indictment against Andy Miller was found and returned into Court, was destroyed by fire on the 19th day of December, 1881, by the burning of the Courthouse."

Upon this return the case was submitted.

The attorney for appellant, in his brief, has not insisted that there were any errors in the rulings of the trial Judge, or that there was a want of evidence to sustain the verdict, but submits that the judgment should be reversed under decisions of this Court cited, because of the destroyed record entries, which have not been restored; and he further states that the present Judge of the Perry Circuit Court was the prosecuting attorney when the indictment was found, that the then clerk has removed from the county, and the special Judge who tried the case is *functus officio*, and submits that the burned record can therefore never be restored, and that appellant should be discharged.

The following is the indictment and its endorsements as they appear in the transcript before us:

"STATE OF ARKANSAS,

   vs.

 ANDY MILLER.

     *Perry Circuit Court, October term,* 1881.

The grand jury of Perry county, in the name and by the authority of the State of Arkansas, accuse Andy Miller of the crime of murder in the first degree, com-

mitted as follows: The said Andy Miller, on the 17th day of September, 1881, in the county and State aforesaid, did feloniously, wilfully, premeditatedly and with malice aforethought, with a shot gun loaded with gunpowder and leaden bul'ets, kill and murder one Joseph Miller, by shooting him, the said Joseph Miller, with said gun, against the peace and dignity of the State of Arkansas.

(Signed)            J. P. HENDERSON,

*Pros. Att'y., 7th Judicial Circuit, pro tem.*"

"Endorsed,

State of Arkansas v. Andy Miller. Indictment. A true bill.

(Signed)            J. S. ODOM, *Foreman.*"

"Witnesses—Robert Mann, Elizabeth Mann, J. W. Bly, Solomon Sack, W. J. G. Young, Sarah Miller."

"Filed in open Court this 15th day of October, 1881.

A. L. McGAHEY, *Clerk.*"

"Issue bench warrant. No bail allowed.

J. M. SMITH, *Judge.*

"STATE OF ARKANSAS, ⎰
    County of Perry. ⎱

I hereby certify the foregoing indictment was filed in my office on the 1st day of April, 1882, and that the same is now duly recorded in record book A, page 6 for the record of indictments.

A. L. McGAHY,

*Clerk and ex officio Recorder.*"

It was upon this record of the indictment and its endorsements that appellant was arraigned, and pleaded not guilty.

It was proven on the trial that the courthouse had been burned, but no question was raised about the burned record, and no proof offered as to its contents.

This Court has repeatedly decided that the entry showing the empanneling of the grand jury, is part of the record in every criminal case prosecuted upon an indictment found by such grand jury, and that on appeal or writ of error, such entry should be copied into the transcript, as well as the record entry showing that the indictment was returned into Court by the grand jury. And when such entries do not appear in the transcript, it has been the practice of the Court, in favor of life or liberty, to award a *certiorari* to supply the omission, before affirming a judgment of conviction. And if it appeared from the return upon the *certiorari* that there was no record entry of the impanneling of the grand jury, or of the return of the indictment into court by the grand jury, the practice has been to reverse the judgment of conviction. *Green v. State*, 19 *Ark.*, 178.

Where the record shows that the grand jury was impanneled, and the indictment returned by them into Court, irregularities in summoning, impanneling, or questions as to the qualifications of the jurors, have been treated as matters in abatement, and waived by the plea of not guilty, which is a plea in bar. *Shropshire v. State*, 12 *Ark.*, 190; *Fenalty v. State*, *Ib.*, 630; *Stewart v. State*, 13 *Ib.*, 744; *Straughn v. State*, 16 *Ib.*, 41; *Brown v. State*, 13 *Ib.*, 96.

This is the first case in which it has appeared by return upon a writ of *certiorari* to this Court, that the record entries showing the impanneling of the grand jury, and the return by them of the indictment into Court, had been destroyed by the burning of a courthouse pending the prosecution, and therefore the omissions in the transcript could not be supplied.

We are not disposed to depart from the long established rules of practice of this Court on the one hand, nor

upon the other to permit, if it may be safely avoided, the administration of public justice to be defeated by the burning of courthouses, and the destruction by fire or otherwise, of records.

The purpose of the Act of March 19th, 1881, was to prevent such evil. It provides: "That hereafter it shall be the duty of the several clerks of the Circuit Courts of this State, whenever an arrest shall have been made of any person, against whom an indictment has been found by the grand jury, properly returned, to record such indictment, with the entries thereon, in a book to be kept by him for that purpose. *Sec.* 1.

"That in all cases where an indictment may be lost or destroyed, or where the same cannot be found, a copy of the record thereof, as provided in the first section of this Act, duly certified by such clerk under his hand and seal of said Court, shall be taken and used for all purposes in any of the courts of this State, the same as the original indictment. *Sec.* 2. *Acts of* 1881, *p.* 106.

It was under this Act that the indictment in this case was recorded, and under it appellant was arraigned upon the recorded copy, and pleaded not guilty.

It was proven upon the trial that he had been arrested under a warrant issued upon the indictment, escaped jail and had been re-arrested.

The clerk, under the Act, was only authorized to record indictments found by a grand jury, and properly returned into Court. There is a legal presumption arising from the fact that he recorded the indictment in question, that it had been found by a grand jury, and returned into Court. The law presumes that all officers discharge their official duties until the contrary is shown.

Moreover, the indictment purports on its face to have

been found by a grand jury. It is signed by the prosecuting attorney. It is endorsed a true bill by a person signing his name as foreman. Also endorsed by the clerk, filed in open Court, and the then presiding Circuit Judge endorsed an order on it that a bench warrant issue, and no bail be allowed.

With all these evidences of genuineness, there is not the sligh'est probability that the indictment is spurious, or that it was not in fact found and returned into Court by a grand jury.

On the merits of the case we find no error for which the judgment should be reversed. There was evidence to sustain the verdict. The Court refused some instructions asked for appellant, as formulated, but the substance of them was given in the general charge of the Court, which was full and fair. The *corpus delicti* was directly proven, and the general charge of the Court left it to the jury to decide upon all the facts and circumstances in evidence, whether appellant shot the deceased, as alleged, and if so, whether it was murder in the first or second degree, voluntary manslaughter or self-defence, which were correctly defined by the Court. The jury found appellant guilty of murder in the second degree; the Court refused him a new trial, and we find in the transcript nothing to warrant us to disturb the verdict without an infringement upon the province of the jury to weigh and pass upon the sufficiency of the evidence.

The power of the Court below to cause the burned record to be restored by proper proceedings, is not doubted.

Had appellant pleaded in abatement that the indictment had not been been found and returned into Court by the grand jury, on the trial of an issue to such plea, it

would have been necessary for the State to produce the original or restored record entries, showing such facts, or prove the destruction of the record entries, that they had not been restored, and resort to secondary evidence of their contents. But no such plea was interposed, but a plea putting in issue the facts alleged in the indictment.

True, as matter of caution in favor of life or liberty, this Court has followed the practice of not affirming a judgment of conviction on plea of not guilty, without the presence of the transcript of entries showing that the indictment was found and returned into Court by a grand jury, as stated above. But we have endeavored to show above, the reasons why we do not deem it necessary to apply the practice in this case, as we would if there was the slightest ground on which to found a doubt that the indictment was in fact found and returned into Court by a grand jury.

Affirmed.

#### DISSENTING OPINION BY

Eakin, J. This case raises a question of procedure on appeal, which, in this State, is new. I am well enough satisfied that my associates, in their opinion, have done no real injustice to appellant, but I cannot know that judicially, and besides, am unwilling to depart from the heretofore inflexible rule of the Court, that the record must in all cases show, affirmatively, that the grand jury was duly empannelled and sworn, and brought the indictment into Court. This is a matter of great importance, inasmuch as the bill of rights in our Constitution has provided, with some exceptions not touching this case, that no one shall be held to answer a criminal charge unless on the presentment or indictment of a grand jury. Heretofore this Court has guarded this

right, very firmly by refusing to approve any conviction, unless it should appear that it had been respected. It does not now propose to dispense with a showing that a grand jury had been empannelled and an indictment properly found. But it adopts new modes of proof, heretofore considered wholly incompetent, and establishes a precedent, which, harmless perhaps at present, may come, in more turbulent and arbitrary periods, to endanger the liberties of the subject.

Neither the indictment itself nor its endorsements can be made evidence that a grand jury was empannelled and brought it into Court, without violation of the previous ruling of the Court. It had been recorded as required by law, but the record was only intended for its own preservation against loss or abstraction, and not to make it evidential of previous proceedings. The Clerk before recording it is not required judicially to determine that it had been properly brought into Court, by a grand jury empannelled and sworn.

Further with regard to the Judge's endorsement for bail. It does not, by any means, preclude the prisoner from questioning the validity of the procedure by which he has been called to answer. It is not made in his presence, and is directed to the sole object of securing his appearance. It may be very true that a prudent and conscientious Clerk would not mark an instrument filed, and record it, unless he had assurance that it was a proper one, and a good Judge would not require bail without like assurance on his part; but constitutional guaranties are intended to guard against possible abuses. Nothing endorsed upon the indictment nor apparent on its face, would be, separately, evidence of the existence of the proper record, and cannot become so cumulatively.

Miller v. The State.

We cannot know that the records have been burnt or destroyed. The certificate of the Clerk in response to the *certiorari* cannot be taken as evidence of any fact he may state by way of explanation or excuse. *Keller v. Killain et al, 9th Iowa,* 329; *Freeland et al v. Board of Supervisors,* 27 *Ill.,* 303. It is the duty of the Clerk simply to obey the writ by sending up the copy of all he has, and to certify to that effect; and the Appellate Court can only act on what he sends, without any regard to extrinsic matters which he may also choose to certify. It incidentally appears in the record that the Court House had been burned, but nothing is said of the records. It is going a great way to presume from that, that the records of this case had been burned with it, and that if they had not been burned they would have shown that the indictment had been properly found. In the case of *Graham v. State,* 43 *Texas,* 552, the Court said: "When the liberty of a party is jeopardised, * * * the Court cannot supply, by presumption, a defect in the record, that the statute requires shall verify itself by inspection." We have always required that the record should show by inspection, the matter which is defective here. But if it were properly shown that the records in this case had been destroyed by fire, it would not justify this Court in dispensing with record evidence that a grand jury had been empannelled, and had brought in the indictment. It would not necessarily follow that a person properly convicted would escape, and if it did, it would perhaps be a lesser evil than for a person *not* properly indicted and convicted, to be cut off by accident, from the opportunity of questioning the proceeding—which he would be if these presumptions be allowed, and he cannot prove a negative.

32

Until the Legislature may provide some better means of meeting such accidents, we ought, I think, to adhere to the common law rules, and require the record to be amended, if it may be done, so as to show the facts, and then to act upon that. I do not think any accident, or urgent necessity for the vindication of the law in a particular case, should impel us to make exceptions to wholesome rules, either by presumptions which endanger the rights of freemen, or upon facts imported into the case from the unauthorized certificates of clerks, or from briefs of counsel.

The Circuit Court had inherent power, independently of any statute, to supply the defective record by *nunc pro tunc* entries, so as to make it declare any fact which truly happened; and such amended record brought here on *certiorari* might be considered. It might and should have been done, on suggestion of the State's Attorney, after the destruction of the Court House, and before the trial. The Court, on being advised of the loss, ought to have required it to be done, before allowing a trial on an indictment which had no record to support it. It might have been done after the appeal. It may be done now, and the amended record brought up. We have no right to assume that it is impossible as a matter of fact. That does not appear in the transcript. I do not think we should waive all these things, and indulge in presumptions, for the sake of dispatch, or to save expense, or for any other reason.

In *Freed v. State*, 21 *Ark.*, 226, which was a case of murder, an amended record was brought up on *certiorari*. It was objected there, that the Court had no power to cause the record to be amended after the appeal was granted. Chief Justice English, delivering the opinion, said there was nothing in that objection—that the in-

stances were frequent where it had been done after appeal or writ of error, citing *McNeil v. Arnold et al*, 17 *Ark.*, 157, in which also he had delivered the opinion of this Court. In the latter case he remarked that the power of the Circuit Court to amend its record, so as to make it speak the truth, and the mode of doing it had been sufficiently discussed and settled in several cases which he cites. One of these cases is *Arrington v. Conroy et al*, Mr. Justice Hanley delivering the opinion, 17 *Ark.*, 100. It was there held that this power of the Court did not arise from the statute of jeofails, but was an inherent power, enabling it to amend in whatever might be necessary to make the record speak the truth, whenever required by the ends of justice.

If it be true that this indictment was found by a proper grand jury and brought into Court, the ends of justice repuire that the record should be made to show the facts. The mode pointed out in our decisions is by *nunc pro tunc* entries. There never was needed, in any State, any act to enable the superior Courts, in either civil or criminal matters, to supply the omission or defects, or correct errors in their records, so as to make them speak the truth, either at the same term, or any other term, or thirty years afterwards.

To the same effect is *King and Houston v. State Bank*, 4th *English*, 187, in an opinion delivered by Mr. Justice Scott. The power is there put upon very high grounds and made very extensive in its application; and the most eminent of English jurists are quoted in its support.

There cannot be a shadow of doubt of the *power* of the Perry Circuit Court to make its records show the truth in the matter of this indictment. Of the *practicability* of it, we cannot judge, from anything we know.

In the case of *Buckman v. Whitney and Woods*, 24 *Cal.*,

267, it was held that the Supreme Court had no power over the records of the Court below and could make no order to supply a lost record, but that the duty was within the province of the District Court, and the power was not affected nor suspended by the appeal. It still controlled its own records and *had capacity to supply their place when lost,* and should do so on proper application. It will be seen that the power extends beyond mere amendment of clerical errors, extending to supply the place of records that have been lost. It meets the requirements of the case in judgment. The English cases are, some of them, cited in *Dubois v. Thomas,* 14*th South Carolina Reports,* 30, which was a case like this, of a record lost or destroyed. In *King v. Bolton,* 1 *Stra.,* 140, a *stolen* record was supplied by the King's Bench. In *Evans v. Thomas,* 2 *Stra.,* 833, a judgment roll, lost after being docketed, was restored. Also in the case of *Dayrell v. Bridge,* 2 *Ib.,* 1264, a new *postea* was ordered to be made out in place of a lost one; and in *Douglass v. Yellof,* 2*d Burr,* a judgment which had been entered and lost for thirty years was restored and entered *nunc pro tunc.* The same powers devolve on the superior Courts of law in the United States. *Dubois v. Thomas, (supra).*

I think we should either adhere to the rule that the record should show the empannelling of the grand jury and the finding of the indictment, or abandon it altogether. I think the former best.

There is no reason furnished for dispensing with it, in this case, of which we can take judicial cognizance. If it were certain that the record was burned, the Circuit Court has the power to restore it, and show the truth, and bring up the amended record on *certiorari,* and the State should do that. The onus is on her, otherwise it

can never appear affirmatively, as it must, that the appellant has been constitutionally convicted.

I think the appeal should be suspended until a term of the Perry County Court may have passed, to enable the State to do this. If she cannot, now, it is very certain she might have done it while the matter was fresh, and that appellant should not suffer for the neglect. In that case he should be discharged, even if we were morally sure that he belongs to the ninety-nine, of which the cautious old English maxim speaks. There was a profound wisdom at the bottom of those old maxims, however absurd they may now appear, in an age rather zealous to punish all offenders speedily, for the public good. They were the seeds from which grew the wonderful Saxon Constitutions—the fairest nurseries of personal freedom surrounded by the sturdiest ramparts the world has ever known.

I fear the action of the Court in this case is premature and erroneous; and that it will make an unsafe precedent. The English liberty which we inherited, would never have been preserved to posterity, to be built into our constitutions, but for the fidelity with which her courts maintained its theories and preserved its forms under all circumstances.